(*Circuit Court of Cook County. In Chancery.*)

## Thomas H. Purcell, et al.

### vs.

## Pittsburgh, Cincinnati, Chicago & St. Louis Railway Company, et al.

(November 10, 1893.)

1. CARRIERS—DEMURRAGE OR CAR-SERVICE CHARGES—LIEN FOR DEMURRAGE OR CAR-SERVICE CHARGES UPON OTHER SHIPMENTS. A carrier cannot hold one consignment of freight for demurrage or car-service charges which had occurred upon another consignment,

or for any sums which might be due the carrier upon other accounts, or for other general indebtedness.

2. CARRIERS—PRIVATE SIDE-TRACKS—DUTY OF CARRIER TO MAKE SIDE-TRACK CONNECTIONS, AND TO DELIVER ON SUCH SIDE-TRACKS. A railroad company is bound by law in this state and by a fair interpretation of the constitution of the state not only to allow switch connections to be made, but to deliver cars of coal on such side-tracks, where a shipper has yards and side-tracks connected by switches with the tracks of the railroad company.

3. CARRIERS—DELIVERY UPON PRIVATE SIDE-TRACKS—WHEN LIABILITY OF CARRIER CEASES. When a carrier has placed cars upon a side-track for delivery, the relation of common carrier ceases.

4. CARRIERS—DEMURRAGE OR CAR-SERVICE CHARGES—LIEN. A carrier has a lien upon specific goods for reasonable demurrage or car-service charges accruing upon such goods.

5. CARRIERS—RIGHT OF CONSIGNEE WHERE UNREASONABLE DEMURRAGE OR CAR-SERVICE CHARGES ARE IMPOSED—PAYMENT UNDER PROTEST —REPLEVIN. If a carrier makes an unreasonable demurrage or car-service or other charge, the owner or consignee can make tender replevin or pay under protest.

6. CARRIERS—DEMURRAGE OR CAR-SERVICE CHARGES—LIEN. The complainant filed a bill for injunction alleging that the defendant refused to deliver certain cars of coal because complainant was indebted to defendant railroad for car-service or demurrage charges which had accrued upon prior shipments, and that the defendant claimed a lien upon such cars of coal for demurrage or car-service charges accruing thereon. A mandatory injunction was sought to compel the railroad company to deliver to complainant the cars of coal in its possession, and to continue to deliver coal as received. A preliminary injunction was issued. Upon hearing *held* that the railroad had a lien upon the specific shipment for demurrage charges accruing thereon, but that the railroad had no lien on such shipment for demurrage or car-service or other charges accruing on other shipments and could not refuse to deliver cars on that account.

Bill for a mandatory injunction. Heard before Judge Oliver H. Horton.

## STATEMENT OF FACTS.

Thomas H. Purcell & Bro., coal dealers in the city of Chicago were accustomed to receive coal in carload lots over the Pittsburg, Cincinnati, Chicago & St. Louis Railroad. In December, 1891, the railroad company refused to deliver certain

cars of coal which were then in its possession, the agent of the company claiming that the Purcells were indebted to the company for car-service charges which had accrued upon prior shipments of coal, and also for the cost of laying certain side-tracks, and also for car-service charges which had accrued upon the specific car held. Under the rules and regulations of the railroads entering Chicago, as promulgated by the car service association, a consignee is allowed a certain number of days for receiving and unloading freight, the time being longer on coal than any other class of freight. Purcell filed his bill in the circuit court, asking for a mandatory injunction compelling the railroad company to deliver the cars of coal then in its possession, and to continue to deliver coal as received, setting forth that the railroad company claimed to hold the coal then in its possession not only for charges which had accrued but for charges upon prior shipments, which had been delivered, and also for the expense of building a side-track. A preliminary injunction was granted upon the bill. The car-service association afterwards appeared in the case, filed an answer and a cross-bill, and upon a reference of the case to master in chancery I. K. Boyeson, evidence was taken and a hearing had upon bill and answer, cross-bill and answer, and upon the evidence taken. Both in the pleadings and at the hearing, the railroad company made no attempt to claim any lien on the freight for charges which had accrued on prior shipments of freight or for any sums due for the construction of a side-track. The only claim made by counsel for the car-service association was that the specific freight in the possession of the railroad company at the time of the filing of the bill should be held for the specific charges which had accrued upon that freight by reason of alleged unreasonable delay on the part of the complainants in receiving and unloading the cars. The master in chancery held that a railroad company could not hold one consignment of freight for any charges which had accrued upon another, or for any sums which might be due the railroad company upon other accounts, such as the construction of side-tracks; and the master also held that the railroad company had a lien upon

the freight in question under the published notices, rules and regulations, and provisions in the bill of lading, all of which provided that freight should be subject to car-service or demurrage charges at the point of destination; and after careful and equitable computation he found that the sum of forty dollars was due the railroad company for car-service charges.

Exceptions were taken to the master's report, and the case was heard and argued before Judge Horton.

*William Burry*, solicitor for complainants.

*Walker & Eddy*, solicitors for defendants.

HORTON, J. (orally):—

I have not prepared a written opinion in this case. While I have examined many of your authorities, I have not felt it necessary to review all these authorities in a written opinion. What I have to say, therefore, is more in the nature of my conclusions in the matter, with some references to the facts and the law.

The question as originally presented in this case by the bill Thomas Purcell filed originally, was the right of the railroad company to hold his coal, claiming a lien thereon for charges on former shipments and for a claim of a balance due for construction of side-tracks into his yard. An injunction was granted upon that bill, and that position has since been substantially abandoned by the present counsel in the case, and I think wisely abandoned, for no court could sustain such a position as claimed by the freight agent, I think it was, of the railway company—could not sustain it at all. The question, however, that has now been presented to the court, is this: The complainant is the receiver of large quantities of coal shipped in bulk, from Ohio, I believe it is, from out of the state. It is claimed on the part of the railway company that the defendant unnecessarily delayed the unloading of the cars, and that the railway company has a right to a car-service charge or demurrage, or whatever you please to name it, for the use of these cars beyond a reasonable time for unloading, under the rules. The case was originally wisely

brought, in my opinion, and would have been sustained upon the issue as originally presented.

There have been elaborate oral arguments and I have been furnished with very elaborate printed briefs in the case. The freight was coal in bulk. The complainant had a yard and side-track connected by switches with the defendant railway company's tracks. The railway company was therefore bound by law in this state, and I think by a fair interpretation of the constitution, by the constitution of the state, not only to allow that switch connection to be made, but to deliver the coal in the yard of the defendant on the track, or rather, deliver the cars loaded on the track. Were it not for the case of the *Chicago & Northwestern R. Co. v. Jenkins*, 103 Ill. 588, this court would have had no serious trouble in this case. That case at first seems to be conclusive of the question now before the court. That case was decided upon an agreed statement of facts, and at my request I have been furnished with and have examined a copy of this agreement as filed in the supreme court which passed upon the case. When the facts in that case are examined and compared with the details of the case at bar, it will be seen that they differ materially. For instance, a sentence from their opinion, on page 600, the supreme court say: "But the mode of doing business by the two kinds of carriers is essentially different." That is, carriers by sea and carriers by rail, the opinion not recognizing, though not excluding, that carriage by water on our lakes is carriage by sea. "Railroad companies have warehouses in which to store freights. Owners of vessels have none. Railroads discharge cargoes carried by them. Carriers by ship do not, but it is done by the consignee. The masters of vessels provide in the contract for demurrage, while railroads do not, and it is seen these essential differences are, under the rules of the maritime law, wholly inapplicable to railroad carriers."

It appears in the evidence, and perhaps the court should take judicial cognizance of the fact that the railway company has no warehouse for the storage of coal shipped in bulk. Another difference in facts is that the railroad company is

required by law to deliver its coal into the complainant's yard. Again, it is the duty of the consignee to unload this coal, the same as it is the duty of the consignee to unload a vessel. There is no demurrage as such, in a technical sense of demurrage, claimed in this case. There was no bill of lading accompanying the coal, but it was the custom as between this railway company and this consignee and the consignor, to ship the coal without bills of lading. I do not know what the railway's custom is. They have some sort of checks or bills for the use of their conductors, and they are delivered with the goods.

In these essential facts and elements, the case at bar differs from the case of *C. & N. W. Ry. v. Jenkins,* 103 Ill. 588.

It is argued that the railway companies might impose great hardships upon shippers if allowed a lien upon freight for such reasonable charges as have accrued for the use of cars after reasonable time has elapsed for unloading, and indeed, that might be so, and the argument impressed me with considerable force. But on the other hand, if the railway company has the right to store freight, such as coal, upon the expiration of forty-eight hours or whatever time is considered reasonable, they might run the cars out and store them on vacant property from which the carriage would be more than the coal is worth. That is, if railways were inclined to subject shippers to inconvenience, the opportunities would be quite as great under one method of doing business as under the other.

As remarked by the supreme court in the *Jenkins Case* (103 Ill. 588), there can be no such lien except by contract or where it is allowed by law. There are many classes of cases where a lien is allowed, and where, without any specific contract to that effect, the law sustains it, such as inkeepers, agisters, carriers, bailees and warehousemen. Demurrage, as such, technically, can not be sustained, but the right of lien is not limited here technically to the word demurrage, or to what may be defined demurrage. When the railway company placed the cars in the yard, the relation of common carrier ceased, it seems to me. When these cars were shunted

onto the side track in the yards of the complainant, then the
relation of common carrier ceased; but was not the railway
company furnishing storage for this party? Substantially
the same relation exists when cars where set upon a side track
ready to be delivered and complainants did not receive them.
It seems to me that the company, under such circumstances,
would be sustained in so leaving the coal in cars, and consid-
ering the class of freight, it is a proper place to store it. It
would not be the proper place to store paper, such as was the
subject matter of the *Jenkins Case* (103 Ill. 588), but it would
be for bulk coal. Whether it be called demurrage or car serv-
ice, or whatever it may be, it seems that the company is enti-
tled to a lien for proper charge. If they make an unreason-
able charge, the plaintiff can make tender, replevin or pay
under protest.

It is claimed that the railway company has the right to sue
for the charge, whatever it may be. That is undoubtedly
true, but in this case the proof shows that this coal is some-
times sold in carload lots from one person to another, and
passes through several hands while it remains on the cars
of the company; that the complainants sell it in bulk and
have the cars put into their yards and the purchaser takes
the coal off the cars, the purchaser doing the unloading and
the complainants having nothing to do with it.

If the company is to look to the parties in a civil suit for
the money, they have to sue as many parties as were owners
of the coal while it remained on the cars. I do not think that
a reasonable rule for the court to establish. The railways
have no right to throttle a man as this company undertook
to, according to the bill originally filed. They can not hold
freight in their possession for charges which have accrued
upon freight delivered or for other general indebtedness.
That was the allegation of the bill as originally filed, but in
the case as finally submitted to the court, the question raised
was as to the right of the company to hold freight for car
service or storage charged which had accrued upon that par-
ticular freight. The amount involved in the case is small,
and the court has not taken the time to exhaustively review

the figures and accounts submitted in evidence, for I apprehend that it makes little difference to counsel whether the amount awarded be a few dollars, more or less, for whether the claim be for one dollar or for forty dollars or more, the principle is the same and it is the question of law which the court must decide and which is of importance in the case. Therefore the finding of the master as to the amount due the railroad company is not disturbed.

So far as I have seen or examined the facts of the cases like the *Jenkins Case* (103 Ill. 588), which hold that the railway company must unload and store, the freight involved was such as could be unloaded and stored in warehouses; none of the cases applied to property such as coal, which can not be readily and practically unloaded and stored.

Perhaps the proper order would be the dismissal of the bill for want of equity, but counsel may confer together and prepare an order in accordance with the opinion of the court.

### NOTE

## DEMURRAGE OR CAR-SERVICE CHARGES.

I.   Reasons for demurrage charges.
II.  Lien of carrier for demurrage charges.
    (A) Carrier has lien for demurrage charges.
    (B) Cases *contra* that carrier has no lien for demurrage charges.
    (C) Liability of consignee for demurrage accruing at any time on the shipment.
III. Validity of car-service associations.
IV.  Right of a carrier to refuse to switch shipments to private side tracks because of unpaid demurrage charges on other shipments.
V.   Right of carrier to assess demurrage charges when connecting line or consignee is unable to receive the shipment.
VI.  Statutes in relation to demurrage charges.
VII. Reciprocal demurrage.

I.

REASONS FOR DEMURRAGE OR CAR-SERVICE CHARGES.

The reason for, and the justice of, demurrage charges made by carriers is well stated in *Swan v. L. & N. R. R. Co.*, 106 Tenn. 229, 61

S. W. 57 (1901), where it is said: "If a road can not make a reasonable charge for detention of its cars by consignees, it is evident that such consignees may delay unloading until virtually the entire rolling stock of the road may be tied up, and its traffic obstructed by loaded cars, awaiting the pleasure or convenience of consignees. We can see no reason why carriers should not be entitled to reasonable compensation for the unreasonable delay and detention of their cars by consignees." And in *Ky. Wagon Mfg. Co. v. Ohio & Miss. V. Ry. Co.*, 98 Ky. 152, the court held that prompt delivery and transporting of freight could not be had by railroads "if their rolling stock may be tied up and waterlogged upon the private sidetracks and switches of consignees to serve as store rooms and warehouses for their freight," and "how can they furnish cars and transportation to shippers in general, and discharge the volume of traffic business of their respective systems, if their rolling stock can be locked up in the private yards of special consignees?" In *Dixon v. Central of Georgia Railway Co.*, 110 Ga. 173, 35 S. E. 369 (1900), the court said: "*Demurrage* was no doubt adopted as a convenient term to represent the storage of goods in cars, as distinguished from the storage in warehouse. The right to charge for such storage in cars arises when the goods are necessarily detained by virtue of the failure of the shipper to comply with his obligations to the carrier. The company is in this way deprived of the use of its cars, and, even if the rules adopted in this particular case as to such charges did not apply, they would still be entitled to reasonable charges as a warehouseman or as a depository for hire."

II.

### LIEN OF CARRIER FOR DEMURRAGE CHARGES.

#### A. Carrier Has Lien for Demurrage.

It is almost universally held that a carrier has the right to make reasonable demurrage or car-service charges, and to enforce a lien on the goods shipped for the payment of such charges.

*Alabama:* *Construction Co. v. R. R. Co.*, 121 Ala. 621, 25 So. 579 (1899); *So. R. R. Co. v. Lockwood Mfg. Co.*, 142 Ala. 322, 37 So. 667, 68 L. R. A. 227 (1904).

*Georgia:* *Dixon v. Central of Ga. Ry. Co.*, 110 Ga. 173, 35 S. E. 369 (1900); *Penn. Steel Co. v. R. R. & Banking Co.*, 94 Ga. 636, 21 S. E. 577 (1894).

*Illinois:* *Schumacher v. C. & N. W. Ry. Co.*, 207 Ill. 199, 69 N. E. 825 (1904); *C. C. C. & St. L. R. Co. v. Probst Lumber Co.*, 114 Ill. App. 659 (1904); *C. P. & St. L. R. Co. v. Dorsey Fuel Co.*, 112 Ill. App. 382 (1904); *Woolner Distilling Co. v. Peoria & Eastern Ry. Co.*, Ill. App. Ct. (2d. Dist.), No. 4816, decided Nov. 20, 1907; *Purcell v. P. C. C. & St. L. R. Co.*, 2 Ill. C. C. 378.

*Kansas: Larrabee Flour Mills Co. v. M. P. Ry. Co.*, 88 Pac. 72 (Kan. Jan. 12, 1907).

*Kentucky: Ky. Wagon Co. v. Ohio & C. Ry. Co.*, 98 Ky. 152, 32 S. W. 595, 36 L. R. A. 850 (1895).

*Massachusetts: Miller v. Mansfield*, 112 Mass. 260 (1873).

*Mississippi: Yazoo & M. R. R. Co. v. Searles*, 83 Miss. 721, 37 So. 939, 68 L. R. A. 715 (1905); *N. O. & N. E. R. R. Co. v. George*, 82 Miss. 710, 35 So. 193 (1903).

*Missouri: Owen v. R. R. Co.*, 83 Mo. 454, 464 (1884); *McGee v. Ry. Co.*, 71 Mo. App. 310, 314 (1897); *Darlington v. R. Co.*, 99 Mo. App. 1, 72 S. W. 122 (1902).

*Ohio: B. & O. R. Co. v. Fisher*, 3 Oh. N. P. 122, 5 Oh. Dec. 659 (1894); *N. Y. L. E., etc. R. Co. v. Seiberling*, 8 Oh. C. C. 593, 4 O. C. D. 210; *Phillips v. Erie Ry.*, 14 Oh. Dec. N. P. 706, 27 Oh. C. C. 486 (1905).

*Tennessee: Swan v. L. & N. R. Co.*, 106 Tenn. 229, 61 S. W. 57 (1901).

*Texas: T. & N. O. R. R. Co. v. Kolp* (Texas) 88 S. W. 417 (1905); *Hunt v. M. & I. T. Ry.* (Texas) 31 S. W. 523 (1895); *Baumbach v. T. C. & O. F. Ry.* (Texas) 23 S. W. 693 (1893).

*Virginia: R. R. Co. v. Commonwealth*, 102 Va. 599, 46 S. E. 911 (1904); *R. R. Co. v. Adams*, 90 Va. 393, 18 S. E. 673, 22 L. R. A. 530 (1894).

*Wyoming: K. P. Ry. Co. v. McCann*, 2 Wyoming 3 (1877).

*United States: Michie v. N. Y. N. H. & H. R. Co.*, 151 Fed. 644 (1907); *Millers' Ass'n v. P. & R. Ry. Co.*, 8 Inter. Com. Rep. 531 (1900); *Blackman v. So. R. Co.*, 10 Inter. Com. Rep. 353 (1904); *Kehoe v. C. & W. C. Ry. Co.*, 11 Inter. Com. Rep. 531 (1905); *Mason v. R. R. Co.*, 12 Inter. Com. Rep. 70.

*Canada: Duthie v. Grand Trunk Ry. Co.*, 4 Can. Ry. Cas. 304 (1906).

*England: Carrington v. London & N. W. Ry.* (1905) 2 K. B. 437.

B. *Cases contra, That Carrier has no Lien for Demurrage.*

In several of the older cases it was held that a carrier had no lien for demurrage charges, but some of these cases have been overruled by later decisions. *C. & N. W. Ry. Co. v. Jenkins*, 103 Ill. 588 (overruled by *Schumacher v. C. & N. W. Ry.*, 207 Ill. 199, 212); *B. & M. R. Co. v. Chicago Lumber Co.*, 15 Neb. 390, 19 N. W. 451 (1884), 18 Neb. 303, 25 N. W. 94; *R. R. Co. v. Hunt*, 83 Tenn. 261 (1885), over- ruled in effect by *Swan v. L. & N. R. Co.*, 106 Tenn. 229, 61 S. W. 57 1901).

In *Pennsylvania*, however, it is declared that a carrier can lawfully charge demurrage. *Penn. R. R. Co., v. Midvale Steel Co.*, 201 Pa. St. 624, 51 Atl. 313 (1902). But in *Nicolette Lumber Co. v. People's Coal Co.*, 213 Pa. 376, 62 Atl. 1060, 3 L. R. A. (n. s.) 327, 110 Am. St.

550 (1902), it was held that although a carrier can charge demurrage, it has no lien on the goods for demurrage charges, citing as authority, *C. & N. W. Ry v. Jenkins*, 103 Ill. 528, a case overruled by *Schumacher v. C. & N. W. Ry.*, 207 Ill. 199, 212. And in a later decision the Pennsylvania court has held to the same effect relying on its decision in 213 Pa. 376; *Wallace v. B. & O. R. Co.*, 216 Pa. 311, 65 Atl. 665. (Pa. Jan. 7, 1907.)

*C. Liability of consignee for demurrage accruing at any time on the shipment.*

It has also been held in several cases that a consignee is bound to pay demurrage charges under a provision in a bill of lading accepted by the consignor that the shipment should be subject to such charges. *Penn. R. v. Midvale Steel Co.*, 201 Pa. 630, 51 Atl. 213; *Y. & M. V. R. Co. v. Searles*, 83 Miss. 721, 37 So. 939, 68 L. R. A. 715, 734.

### III.

#### VALIDITY OF CAR-SERVICE ASSOCIATIONS.

Car-service associations, which are combinations of various railroad lines for the purpose of collecting and enforcing uniform demurrage charges are *not* illegal combinations.

*Georgia: Miller v. Cent. Ga. R. R. & Banking Co.*, 88 Ga. 563, 15 S. E. 316, 18 L. R. A. 323 (1891).

*Kentucky: Ky. Wagon Co. v. Ohio & C. Ry. Co.*, 98 Ky. 152, 32 S. W. 595, 36 L. R. A. 850 (1895).

*Mississippi: Yazoo & M. V. Ry. Co. v. Searles*, 83 Miss. 721, 37 So. 939, 68 L. R. A. 715 (1905).

*Ohio: Phillips v. Erie Ry. Co.*, 14 Oh. Dec. N. P. 706, 27 Oh. C. C. 486 (1905). In *Kansas* however by an act of 1907 (*Laws of Kansas, 1907, ch. 250*) car-service or demurrage associations have been declared illegal.

### IV.

#### RIGHT OF A CARRIER TO REFUSE TO SWITCH SHIPMENTS TO PRIVATE SIDE TRACKS BECAUSE OF UNPAID DEMURRAGE CHARGES ON OTHER SHIPMENTS.

The demurrage on car-service rules adopted and enforced by the various car-service associations generally contain a rule that agents will decline to switch cars to private sidings of consignees who refuse to pay or unnecessarily defer settlement of bills for demurrage. For example the rules of the Chicago Car-Service Association, effective July 14, 1907, contain the following rule: (Rule 17 C) "When cars are detained on private tracks beyond the free time for loading or unloading, and car-service charges are not promptly paid, the agent of the railroad company delivering such cars will, after giving

five days' notice, decline to switch cars to private tracks of such parties, and will thereafter tender freight from public team tracks, and collect freight charges before delivery, until such time as satisfactory guaranty is given that car-service rules will be complied with."

The courts generally hold, however, just as in the principal case of *Purcell v. P. C. C. C. & St. L. R. Co.*, that a carrier *cannot* refuse to switch shipments to private sidetracks because of unpaid demurrage or car-service charges on other shipments.

In *So. Railway Co. v. Lockwood*, 142 Ala. 322, 37 So. 667, 68 L. R. A. 227, it was held that if a delivery of part of the goods had been made before the time for unloading has expired, the railroad company was entitled to retain possession of the remainder to secure the payment of demurrage charges subsequently accruing.

And in *N. O. & N. E. R. E. Co. v. George*, 82 Miss. 710, 35 So. 193, where six cars out of twelve constituting a shipment and upon which demurrage charges had accrued had been delivered without payment of the charges having been made, the carrier was held entitled to hold the remaining six cars to secure the payment of demurrage charges upon the twelve cars.

In *Penna. Steel Co. v. Ga. R. R. & Banking Co.*, 94 Ga. 636, 21 S. E. 577, it was decided that a railroad company had the right to retain from each consignment one or more cars to secure itself for the freight and demurrage it claimed on such consignment.

In *Eastern Ky. Ry. Co. v. Holbrook*, 4 Ky. Law Rep. 730, it was held that a carrier cannot refuse to receive freight because back charges for other shipments have not been paid.

In *Phillips Co. v. Erie Railway*, 27 Ohio C. C. 486 (1905), an opinion of a lower court, it appeared that the Phillips Company had refused to pay demurrage charges which had accrued upon cars consigned to it and delivered upon its switch. The railroad company thereupon refused to deliver cars upon the private siding of the Phillips Company, but placed them upon its regular public team track to be unloaded. The plaintiff brought an action to compel the railroad to receive cars from other railroads and switch them upon plaintiff's siding. The railroad set up in its answer the rule of the Cleveland Car-Service Association providing in substance, that when cars are ordered to a private·siding for unloading and the party so ordering them is delinquent in the payment of car-service charges, defendant's agent should decline to place cars on such private siding until such delinquency should be .made good, and should thereupon notify the party using such private siding that his freight would be delivered or received only upon the defendant's public team track until such delinquency should be made good. The court held as a matter of law that such rule was reasonable and valid.

But in *Yazoo & M. V. R. Co. v. Searles*, 83 Miss. 721, 37 So. 939,

68 L. R. A. 715 (1905), it appears that Searles refused absolutely to pay any car service or demurrage charges upon any and all cars delivered on a spur track leading to his warehouse, and that thereupon the carrier refused to switch cars for Searles until accrued demurrage charges were paid. In this case the consignee announced that he would not pay any demurrage charges that had already accrued or that thereafter might accrue and the court held that under such circumstances, the carrier might refuse to switch cars; but the court also held, that if there was merely a dispute as to the amount of the demurrage charges a carrier would not be justified in refusing to switch cars until demurrage charges on other shipments had been paid. The rule of the Louisiana Car-Service Association provided: "On deliveries to private sidings, in cases where consignees or consignors refuse to pay, or unnecessarily defer settlement of bills for car-service charges, the agent will decline to switch cars to the private sidings of such parties, notifying them that deliveries will only be made on public delivery tracks of company and will promptly notify the manager of the action taken." The court in the course of its opinion states the law:

"But it is further said that appellee's wrongful action did not justify the railroad company 'in violating its common-law and statutory obligation' to appellee to deliver freight; this conclusion, of course, being founded on the principle that, in the discharge of its duty to the public, no corporation enjoying a public franchise can conduct its business according to the whim or caprice of its agents, or can arbitrarily, without special reason refuse to serve any one seeking its service. Limiting that general principle to the matter here in dispute, it is likewise true that no carrier has the right, on account alone of a dispute arising from a doubt as to the correctness of a particular bill or several bills for demurrage already past due, or an honest difference of opinion as to the justice of the charge on any number of cars already received and delivered, to refuse to 'switch and place' other cars subsequently received. No carrier can refuse its services to anyone desiring them on the ground alone of an unadjusted claim then pending, or on account of any previous violation of contract by such person, no matter how flagrant and inexcusable, if such person, at the time the service is demanded, is legally entitled thereto. A refusal on the part of the carrier for such case would entitle the person aggrieved or injured to recover full compensation; and, if such action was dictated by vindictive motives, or by a desire to wantonly oppress and injure the particular person, the offending carrier would be liable to punitive damages as well. But this result follows not because the carrier was a member of a car-service association, but by reason of the firmly established and rigidly adhered to rule of law which makes the master respond in damages, both actual and exemplary, for every wanton and wilfully

oppressive violation of duty by the servant, where the servant committing the wrong be a car-service association or other agent or employe. This principle of law is of universal application. It is the duty of the appellant primarily to 'switch and place' all cars coming over its own line or tendered to it with proper 'transfer switching charge' by any connecting line. It was the duty of the appellee to pay all freight charges and demurrage charges due on his freight and the cars containing the same. This, by contract entered into evidenced by the bills of lading, he had bound himself to do. So long as appellee complied with his contract, he had the right to insist on faithful and prompt compliance on his part of appellant. More than this, even if, on account of doubts and disputes as to the correctness or justice of special instances of charge, freight charges or demurrage had been withheld pending adjustment, this would not, of itself, absolve the carrier from the discharge of its duty as to the other car loads of freight subsequently received. No past violation of contract on the part of a consignee can justify a carrier in failing to discharge a present duty."

In *Larrabee Flour Mills Co. v. Missouri Pac. Ry. Co.*, 88 Pac. 72 (Kan. Jan. 12, 1907), it appears that the plaintiff asked for a writ of mandamus to compel the defendant carrier to switch cars to the transfer tracks accessible to plaintiff. Car-service charges had been assessed against the plaintiff who admitted and offered to pay part of the items, but disputed other items. The agent of the carrier demanded payment of the whole bill stating that a claim for a refund for excess charges could be presented to the car-service association. This the plaintiff declined to do, and the carrier then refused to make further delivery to the plaintiff of empty cars placed on the transfer track for its use until payment should be made. The rules of the Missouri Valley Car-Service Association provided:

"Sec. 2. On deliveries to private sidings, should consignees or consignors refuse to pay or unnecessarily defer settlement of bills for car service, the agent will decline to switch cars to the private siding of such parties, notifying them that deliveries will only be made to them on the public delivery tracks of the company, after the payment of freight charges at his office. Agent will promptly notify manager of action taken."

The court held:

"Rule 9 in its application to this case, and the special order issued for the purpose of coercing the plaintiff, are not reasonable. A shipper ought not to be compelled to pay an unjust charge for car service with no redress, but to submit a claim for the return of his money to the manager of the association promulgating the rule or order. The weight of authority seems to be that the carrier has a lien for compensation for the use of cars beyond reasonable free time. If the lien be waived the courts are open. But the car-service

association holds no franchise to compel the payment of claims of this kind, and then to decide for itself whether or not it will refund. And, in any event, a carrier cannot justly withhold its services when it is equally at fault in the matter of which it complains."

And likewise in the principal case of *Purcell v. P. C. C. & St. L. R. R. Co.*, 2 Ill. C. C. 378 (Circuit Court, Cook Co., Ill., 1893), it was held that a railroad could not hold freight in its possession and refuse to switch cars to a private sidetrack because of unpaid demurrage charges on other shipments. And also in *Union Brewing Company v. C. B. & Q. R. R. Co.*, 1 Opinions Illinois Railroad Commission, 61 (1890), it was held that nonpayment of demurrage charges on former shipments does not justify a refusal by the carrier to switch other cars, the commission saying: "We are of opinion that respondent is not released from the legal duty of switching, by the failure of complainant to pay demurrage charges." And the same ruling is also made in *Lyon & Scott v. P. & P. U. Ry. and The Illinois Car-Service Association*, 1 Opinions Illinois Railroad Commission, 69 (1890).

In *Stahl v. B. & M. R. Co.*, 71 N. H. 57, 51 Atl. 176 (1901), it was held that where a carriers' agent refuses to deliver freight transported by it, claiming to hold it for demurrage charges on cars previously transported for the plaintiff, until he can consult his superiors, which he immediately does, and in compliance with their orders, offers the freight before action is brought, such refusal to deliver is not sufficient evidence of conversion of the goods by the carrier.

## V.

RIGHT OF CARRIER TO ASSESS DEMURRAGE CHARGES WHEN CONNECTING LINE OR CONSIGNEE IS UNABLE TO RECEIVE THE SHIPMENT, OR WHEN THE CONNECTING LINE HAS DECLARED AN EMBARGO.

The car-service rules generally contain a provision that when consignees are unable to receive freight or to unload cars and for such reason the delivering line refuses to accept cars from connecting lines consigned to such consignee, the agent of such line holding cars which thus cannot be delivered shall notify the consignee, and shall charge car-service if delivery cannot be affected within a certain time, or within the time allowed for reconsignment.

When a carrier is unable to handle all the goods which are tendered, it may in such case legally claim the right to suspend service either as to certain classes of traffic or altogether, and thus declare an embargo. But it is proper that reasonable and timely notice should be given to connecting carriers of the embargo in order to prevent congestion of cars in freight junction yards. *Daish v. R. R. Co.*, 9 I. C. C. 520; a carrier has however no right to declare an em-

embargo against one individual shipper or consignee while at the same time it makes deliveries to other shippers or consignees at the same point. *Rogers v. R. R. Co.*, 12 I. C. C. 353 (1907).

In *Grand Rapids & Indiana R. R. Co. v. Diether*, 10 Ind. App. 206 (1894), it appears that a car of lumber was shipped from Arkansas directed to Diether at "Fort Wayne, Indiana, Ft. W. C. & L. Delivery," meaning delivery at the station of the Lake Shore & Michigan Southern at Fort Wayne, which was used by the Ft. W. C. & L. Ry. Co. The car was delivered to the Grand Rapids & Indiana Railroad Company, and was hauled by it to its yards in Fort Wayne. The terminus of the G. F. & I. R. Co. was at a Y about one and one-half miles from its station, and one mile from the L. S. & M. S. depot, the destination of the car. According to the usual mode of doing business the G. R. & I. Co. would put the car upon this Y whence it would be taken by the connecting line. The L. S. & M. S. R. Co. refused to accept the car and assume the freight charges in response to a telephone message. No effort was made by the G. R. & I. Co. to make an actual delivery of the car to the L. S. & M. S. R. C. The G. R. & I. R. Co then notified Diether that it held the car at its station and would hold same for charges and also for accruing demurrage. Diether tendered the amount of the freight charges but refused to pay the accrued demurrage. The court *held* that the duty of the R. G. & I. Co. was to carry the car to the end of its line and there deliver it to a connecting carrier to be forwarded to its final point of destination, and that a carrier which has received goods for carriage without requiring prepayment, does not become entitled to demand its freight charges until its duty has been performed, either by delivery or an offer to deliver at the place of destination, and that the G. R. & I. Co. could not rightfully claim that its charges should be paid until it had carried the goods to the end of its line and was ready to deliver them to the succeeding carrier, or had shown a good excuse for its not being done.

In *Woolner Distilling Company v. Peoria & Eastern Ry.* (Appellate Court, Second District, Illinois, Nov. 20, 1907), it was held that a carrier can lawfully assess demurrage charges on cars held in its distributing or storage yards awaiting delivery on the side track of the consignee, where the consignee is unable on account of its inadequate facilities to accommodate all the cars upon its private side track, and is consequently unable to receive cars upon their arrival. The court there said: "Appellant practically insists that because it had room for only five cars it had a right to compel the railroads to store the remaining twenty-five to forty-five carloads of coal for it at its pleasure and without any expense to appellant, and that it could defeat the right of the railroads to charge storage by not furnishing the railroads a place where the cars could be delivered. We think this position unjust. When the terminal had placed the

cars in the Kickapoo yards and had notified appellant that they were ready for delivery, and forty-eight hours had passed and appellant was not able to receive them, the terminal had done all it could do to deliver the coal, and it is just that appellant should pay a reasonable charge for the storage of the cars. It could avoid this result by providing a place where the coal could be unloaded promptly which it had ordered in advance.

## VI.

### Statutes in Relation to Demurrage Charges.

In several of the states there are statutes in relation to demurrage charges and in many of the states, especially those states in which reciprocal demurrage statutes have been passed (referred to *infra*), comprehensive laws on the subject exist. Statutes in relation to demurrage exist in the following states: *Alabama* (Laws of 1907, page 161); *Arkansas* (Acts of 1907, ch. 239); *Colorado* (Laws of 1907, ch. 208); *Connecticut* (Statutes 1902, secs. 3774, 3775); *Florida* (Laws of 1893, page 138); *Georgia* (Code 1895, secs. 2200–2209); *Indiana* (Laws of 1907, Act March 11, 1907); *Kansas* (Laws of 1905, ch. 345; Laws of 1907, ch. 275); *Minnesota* (General Laws of 1907, ch. 23); *Mississippi* (Code of 1906, sec. 4843); *Missouri* (Laws of 1905, page 100; Laws of 1907); *North Dakota* (Laws of North Dakota 1907, ch. 200); *Oklahoma* (Laws of 1905, page 143); *Oregon* (Laws of 1907); *Pennsylvania* (Laws of 1907, page 229); *South Carolina* (Code of 1902, sec. 2094); *South Dakota* (Laws of 1907, ch. 216); *Texas* (Laws of 1907); *Washington* (Laws of 1907, ch. 142).

## VII.

### Reciprocal Demurrage.

Reciprocal demurrage statutes under which a carrier is liable to the shipper for a penalty if a car is not furnished for shipment within a certain period after demand therefor, and a shipper or consignee is liable for a demurrage charge on cars detained after a certain period of time have been enacted in the following states: *Alabama* (Laws of 1907, page 161); *Arkansas* (Acts of 1907, ch. 239); *Colorado* (Laws of 1907, Act March 22, 1907); *Indiana* (Laws of 1907, Act March 11, 1907); *Kansas* (Laws of 1907, ch. 275); *Minnesota* (General Laws of 1907, ch. 23); *Missouri* (Laws of 1907; Laws of 1905, page 100); *North Carolina* (Laws of 1907, ch. 217); *North Dakota* (Laws of North Dakota, 1907, ch. 200); *Oklahoma* (Laws of 1905, page 143); *Oregon* (Laws of 1907); *South Dakota* (Laws of 1907, ch. 216); *Texas* (Laws of 1907); *Washington* (Laws of 1907, ch. 142). In *Mississippi* the Railroad Commission has been held to have power to make rules to reciprocal demurrage. *Y. & M. V. R. Co. v. Keystone Lumber Co.*, 43 So. 604 (Miss. Apr. 15, 1907).

Reciprocal demurrage statutes and regulations have been upheld as constitutional. *Stone v. Atl. Coast Line R. Co.*, 56 S. E. 932 (N. C. 1907); *Y. & M. V. R. Co. v. Keystone Lumber Co.*, 43 So. 605 (Miss. Apr. 15, 1907); *Patterson v. Mo. Pac. Ry.* (Kan. Feb. 8, 1908).

It should be noted however that in *Houston & Texas Cent. R. v. Mayes*, 201 U. S. 321 (Apr. 2, 1906), a Texas statute absolutely requiring railroads under penalties engaged in interstate commerce to furnish certain numbers of cars on a specified day to transport merchandise into another state regardless of every other consideration except strikes and other public calamities was held to transcend the police power of the state and to amount to a burden upon interstate commerce, and when applied to interstate shipments, void as a violation of the commerce clause.—Ed.